IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES B. BOND,

        Plaintiff,

        v.

PATRIOT MORTGAGE CORPORATION,
et al.,

        Defendants.

_____

Case. No. 6:24-cv-689-MC

OPINION & ORDER

MCSHANE, Judge:

    *Pro se* plaintiff James Bond seeks leave to proceed *in forma pauperis* (IFP). This court has discretion in deciding whether to grant *in forma pauperis* status. *See O'Loughlin v. Doe*, 920 F.2d 614, 616 (9th Cir. 1990). To qualify for *in forma pauperis* status, a civil litigant must demonstrate both that the litigant is unable to pay court fees[1] and that the claims the litigant

---

[1] The Court presumes, without deciding, that Plaintiff accurately filled out his application to proceed IFP. While Plaintiff reports no assets and no debts, he also claims to have no monthly expenses. Additionally, Plaintiff alleges that in addition to not having a checking or savings account, he does not have any cash; not even one dollar. Additionally, Plaintiff states here that he was last employed in 2018 when he was "self" employed but received no take home salary or wages. These allegations contrast with the IFP form Plaintiff filed in September 20020 in case 20-1656-AA. There, Plaintiff stated he was "self" employed until March 2020, when his employment ended due to the COVID-19 pandemic. ECF No. 5, 2. Additionally, Plaintiff stated on that IFP application that he earned nearly $6,000 during the 12 months preceding September 2020 and expected to earn up to $30,000 by the end of 2020. Despite these inconsistencies, the Court presumes at this time that Plaintiff is in fact unable to pay court fees.

1 – OPINION AND ORDER

seeks to pursue are not frivolous. 28 U.S.C. § 1915(a)(1), 1915(e)(2)(B)(i); *O'Loughlin*, 920 F.2d at 617.

This action stems from a January 23, 2024 interaction between Plaintiff and two Cottage Grove police officers.[2] As relevant to resolving Plaintiff's IFP application, the President of Patriot Mortgage Corporation allowed Plaintiff to use an upstairs office between noon and 4 p.m. Compl. ¶ 16, ECF No. 1. The President was out of the office and did not relay this authorization to other employees of Patriot Mortgage. Compl. ¶ 16.

Plaintiff arrived at the office and spoke with Patriot Mortgage employee Hudson Weybright. Weybright was covering for another employee, Andrea, out on a lunch break.[3] Compl. ¶ 17. After Andrea returned to the office, Weybright left for the day. Compl. ¶ 18. Weybright did not relay to Andrea that Plaintiff was using the upstairs office. Compl. ¶ 18.

Approximately two hours after arriving at the office, and approximately one hour after Andrea returned from lunch, Plaintiff "proceeded downstairs to use the restroom." Compl. ¶ 18. At this time, Andrea happened to be checking the mailbox outside the office. Compl. ¶ 19.

> When Andrea entered the building her eye caught Mr. Bond's shadow on the wall of the adjacent room as he proceed [sic] up the stairs to the second floor of Patriot Mortgage. Andrea, unaware that Mr. Bond was using the upstairs office from noon to 4:00 p.m., was struck with fear that an intruder had entered Patriot Mortgage after seeing Mr. Bond's shadow on the adjacent room wall and, due to her viable fear, quickly grabbed the office handheld phone, her purse, and left the building to call the local authorities.

Compl. ¶ 19.

"Being located only a few blocks away from the City of Cottage Grove's Police Department, [Cottage Grove police officers John Doe and Adam Butler] arrived a few minutes

---

[2] Plaintiff brings state claims against other, non-government actors, but those allegations are not particularly relevant to the federal claims against the government actors.
[3] As Plaintiff did not provide Andrea's last name, the Court, consistent with the Complaint, refers to this employee merely as "Andrea."

2 – OPINION AND ORDER

later." Compl. ¶ 20. The officers entered the building and announced their presence. Compl. ¶ 20. "Due to Mr. Bond believing that one of President Weybright's friends was playing a joke, he did not respond to the officers [sic] announcement of their presence." Compl. ¶ 20. Indeed, rather than respond to the officers, Plaintiff "continued drafting his legal pleading." Compl. ¶ 21. Only when Plaintiff heard the officers yell "all clear," did Plaintiff yell "hello." Compl. ¶ 21. Plaintiff specifically admits that this "startled the officers because they believed the building to be empty since they just cleared it." Compl. ¶ 22. Plaintiff did not obey the officers' commands:

> Cottage Grove police officers Doe and Butler ordered Mr. Bond to get down on the floor, place his hands behind his head, and cross his feet. Yet Mr. Bond did not hear all of the officers [sic] commands. In particular, his brain did not register the command to place his hands behind his head and, thereby, Mr. Bond placed his hands on the floor next to his face, which was a normal action under the circumstances of a distressed individual faced with the conditions Mr. Bond was.
>
> When officer Doe saw Mr. Bond laying on the ground, he yelled at Mr. Bond that his hands were not on top of his head. Upon hearing this Mr. Bond proceeded to slowly move his hands from the floor to the back of his head while believing that any second he may be shot due to him being shot in a prior encounter with law enforcement and, in this situation, the officers having reasonable suspicion that he may be concealing a weapon and that he is about to use it since his hands were below his face instead of on the back of his head.

Compl. ¶¶ 22–23.

When Plaintiff was on the ground "being held at gunpoint," "officer Doe proceeded to grab Mr. Bond's left wrist and place it behind his back to be cuffed to his right wrist, which prompted Mr. Bond to yell out to officers Doe and Butler that he has a shoulder problem and request that they be gentle with him." Compl. ¶ 24. Plaintiff alleges that while his handcuffs were "excessively tightened," officer Doe "directed Mr. Bond, who was face down on the ground with his hands cuffed behind his back, to stand up. Mr. Bond rolled over and sit up. As Mr. Bond was getting to his feet, CGPD officer Doe, without reasonable cause, pulled Mr. Bond

3 – OPINION AND ORDER

to his feet by his right arm causing physical pain to Mr. Bond's left should and both of his wrists and, additionally, causing two lacerations to the back of Mr. Bond's right hand." Compl. ¶ 25.

The officers searched Plaintiff and placed him in the back of a patrol vehicle. Compl. ¶ 26. "After confirming Mr. Bond's identity and that he had permission to be at Patriot Mortgage, Mr. Bond was released outside the business front door and in plain view of the public. Mr. Bond was neither cited for, not charged with, any crimes. As officer Doe was releasing Mr. Bond, officer Butler asked Mr. Bond if he was '[t]he man with the black BMW" and Mr. Bond confirmed that he was."[4] Compl. ¶ 27 (alterations in original). "Mr. Bond is informed and believes, and intends to prove after conducting relevant discovery, that officers Doe and Butler action [sic] in using excessive force on him was motivated largely or entirely by the fact that Mr. Bond is "[t]he man with the black BMW." Compl. ¶ 31 (alteration in original).

As relevant here, Plaintiff brings Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1983 against the officers. Plaintiff's Fourth Amendment claim is based on the officers' alleged use of excessive force during the seizure. Compl. ¶ 36. Plaintiff's Fourteenth Amendment claim is based on "intentionally discriminating against Mr. Bond based on the fact that he is the man with the black BMW[.]" Compl. ¶ 40. Plaintiff brings *Monell* claims against the City of Cottage Grove based on an alleged failure to train the officers. Compl. ¶¶ 43–47.

## DISCUSSION

"The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007). "Determining whether the force used to affect

---

[4] Plaintiff later references "existing [sic] his 2017 black BMW M3" during an incident with University of Oregon Police Officers which resulted in Plaintiff "taking the officers in hand-to-hand combat[.]" Compl. fn. 1. As relevant to this action, Plaintiff did not list a 2017 Black BMW M3 on his IFP application.

4 – OPINION AND ORDER

Case 6:24-cv-00689-MC    Document 4    Filed 07/03/24    Page 5 of 11

a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989) quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). When evaluating the government's interest in using force, the Court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Ultimately, the issue is whether the totality of the circumstances justified the force used. *Id.*

Here, Plaintiff alleges his handcuffs were too tight and that officer Doe "caus[ed] physical pain to Mr. Bond's left shoulder and both of his wrists" when he "pulled Mr. Bond to his feet by his right arm" "[a]s Mr. Bond was getting to his feet" while handcuffed. Compl. ¶ 25. Under most valid seizures, such a minimal use of force would not rise to the level of a constitutional violation.[5] This is a far cry from the "gratuitous or violent" use of force the Ninth Circuit has generally found to be excessive or unreasonable. *See Hopson v. Alexander*, 71 F.4th 692, 705–06 (9th Cir. 2023) (contrasting case where officers "forcefully removed a suspect from his car and handcuffed him" despite the availability of less forceful options with cases where officers forced suspect onto hood of car and "grabbed his arm and forced it up, applying greater pressure even as the suspect screamed in pain") (cleaned up). Additionally, the facts alleged here are a far cry from the typical seizure.

Even accepting Plaintiffs allegations as true, there is no indication, at all, indicating the officers acted with any intent to apply wanton or gratuitous levels of force. Quite to the contrary, the allegations here justified a far greater amount of force than that used under the circumstances.

---

[5] Although Plaintiff was neither arrested nor charged, there is no doubt the officers had probable cause to seize Plaintiff based on the facts alleged.

5 – OPINION AND ORDER

"It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable." *Alexander v. Co. of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995). Here, the Complaint confirms the officers had every right to believe Plaintiff posed a significant threat justifying being handcuffed pending further investigation.

Plaintiff provides an abundance of specific factual allegations concerning the incident in question. From the allegations, we know that Andrea, the employee who called the police, had no idea there was anyone else in the building when she stepped out to retrieve the mail. Indeed, Plaintiff alleges: "Andrea, unaware that Mr. Bond was using the upstairs office from noon to 4:00 p.m., *was struck with fear that an intruder had entered Patriot Mortgage after seeing Mr. Bond's shadow on the adjacent room wall* and, due to her viable fear, quickly grabbed the office handheld phone, her purse, and left the building to call the local authorities."[6] Compl. ¶ 19 (emphasis added). We know the officers took Andrea's call seriously as they "arrived a few minutes later." Compl. ¶ 27 20. We know that when the officers entered the office, "announcing the presence of Cottage Grove Police," Plaintiff simply chose not to respond.[7] Compl. ¶ 20. We know that when Plaintiff yelled "hello" after hearing the officers yell "all clear," that this "*startled the officers* because they believed the building to be empty since they just cleared it." Compl. ¶ 22 (emphasis added). We know that Plaintiff did not comply with the officers' orders to "get down on the floor, place his hands behind his head, and cross his feet." Compl. ¶ 22. Instead, we know that rather than placing his hands behind his head, Plaintiff "placed his hands

---

[6] Although Plaintiff alleges this entire incident was caused by the negligence of Patriot Mortgage's President not telling employees he gave permission for Plaintiff to use the office, this information was, of course, not known to the officers and is therefore irrelevant to any analysis of the reasonableness of the actions of the officers.
[7] Again, that Plaintiff believed one of the President's "friends was playing a joke" was not known to the officers at the time they were attempting to clear the office.

6 – OPINION AND ORDER

on the floor next to his face[.]"[8] Compl. ¶ 22. We know that Officer Doe recognized Plaintiff's hands were not on top of Plaintiff's head (because Plaintiff alleges Officer Doe yelled this fact to Plaintiff). Compl. ¶ 23. Finally, we know that as Plaintiff "proceeded to slowly move his hands from the floor to the back of his head while believing that any second he may be shot due to . . . *the officers having reasonable suspicion that he may be concealing a weapon and that [Plaintiff] is about to use it* since his hands were below his face instead of on the back of his head." Compl. ¶ 23 (emphasis added).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue." *Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994).

As noted, officers were "startled" when Plaintiff yelled "hello" after the officers believed they had cleared the building. Compl. ¶ 22. This is after officers responded to a call from Andrea, who "was struck with fear that an intruder had entered" the building. Compl. ¶ 19. Additionally, Plaintiff admits that by not following the commands to place his hands on top of his head, the officers had "reasonable suspicion that [Plaintiff] may be concealing a weapon and that he is about to use it[.]" Compl. ¶ 23. There is no question that a decision to tightly handcuff a suspect under these circumstances does not constitute unreasonable force. Additionally, an officer assisting a handcuffed suspect to his feet in these circumstances is not unreasonable.[9]

---

[8] Although Plaintiff alleges "his brain did not register the command to place his hands behind his head," the officers only knew that Plaintiff was not complying with their commands, issued at gunpoint.
[9] Here, the Court takes judicial notice of the obvious fact that it is somewhat difficult to get to one's feet while handcuffed from a position of lying prone on the ground on one's stomach. Merely grabbing a suspect's arm in this

7 – OPINION AND ORDER

A recent Ninth Circuit case is instructive. In *Williamson*, Plaintiff was part of a group of protesters who performed a "die in" during a city council meeting. She and other protesters refused orders to leave "and passively resisted being removed by going limp." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1149 (9th Cir. 2022). Officers handcuffed Williamson and "Williams screamed continually" during the 12 seconds it took officers to pull her, by holding Williamson under her arms, from the room. As they reached the door, one officer let go and the second officer "dragged her through the doorway alone, by her left wrist and forearm." *Id.* at 1150. Once outside, Williamson complained officers hurt her shoulders. Officers double-cuffed Williamson in an attempt to loosen the tension, "but she complained that they were 'still pulling' her arms in doing so." *Id.* Williamson "suffered a sprained wrist, minor swelling, and a torn rotator cuff." *Id.* The court noted:

> Even viewing the evidence in Williamson's favor, the type and amount of force used by the Officers in this case was minimal. The Officers did not strike Williamson, throw her to the ground, or use any compliance techniques or weapons for the purpose of inflicting pain on her. Rather, they held her by her arms and lifted her so they could pull her out of the meeting room after she went limp and refused to leave on her own or cooperate in being removed.

*Id.* at 1152.

The court concluded, "[i]t is undisputed that Williamson's crime was minor, that she posed no threat to anyone, and that she was not actively resisting arrest." Despite that, the court concluded, even viewing the evidence in the light most favorable to Williamson, that the officers did not use excessive force. *Id.* at 1154–55. *Williams* is on point and, based on the specific factual allegations contained in the Complaint, requires one conclusion: i.e., that the officers' use of force here was reasonable and Plaintiff cannot establish a violation of his Fourth Amendment

---

scenario does not amount to unreasonable force under the circumstances. Additionally, as demonstrated below, the Ninth Circuit has found similar conduct from officers—holding a handcuffed suspect's arms or armpits—reasonable despite far less threats of harm.

8 – OPINION AND ORDER

rights. Plaintiff's injuries—of pain in his shoulder and wrists, and "two lacerations to the back of" his hand—are, under any analysis, minor. And unlike the governmental interest in *Williamson*, the governmental interest here was anything but minor. Again, the Court emphasizes that Plaintiff admits that due to not following commands to place his hands on top of his head, the officers had "reasonable suspicion that he may be concealing a weapon and that he is about to use it since his hands were below his face instead of on the back of his head." Compl. ¶ 23. Relevant here, the "most important" consideration in determining the governmental interest at stake is "whether the suspect posed an immediate threat to others." Here, despite Plaintiff unquestionably posing an immediate and significant threat to others—i.e., that he was concealing a weapon that officers believed "he is about to use"—he walked away several minutes after being handcuffed with minor shoulder and wrist pain and two lacerations on his hands. The officers did not violate Plaintiff's Fourth Amendment rights.

Plaintiff's Equal Protection claim fares no better. In order to state a section 1983 claim for violation of the Equal Protection Clause, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citing *Washington v. Davis*, 426 U.S. 229, 239-240 (1976). Plaintiff's Fourteenth Amendment claim is based on "intentionally discriminating against Mr. Bond based on the fact that he is the man with the black BMW[.]" Driving or owing a particular vehicle is not, for equal protection purposes, membership in a protected class. Therefore, Plaintiff's Equal Protection claim necessarily fails.

As Plaintiff's pleadings confirm no individual defendant violated any of Plaintiff's constitutional rights, his *Monell* claim against the City of Cottage Grove necessarily fails. *Lockett v. Co. Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) "*Monell* claims thus require a

9 – OPINION AND ORDER

plaintiff to show an underlying constitutional violation. For example, the Court has held that a jury's determination that an individual officer did not use excessive force *precluded* § 1983 municipal liability on that ground." *Id.* (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

In addition to the *Monell* claims against the City of Cottage Grove, Plaintiff brings *Monell* claims against Patriot Mortgage and Brogan Weybright (the President of Patriot Mortgage). To state a claim under section 1983, the Plaintiff must allege, amongst other things, that the Defendants acted "under color of state law." *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001). Neither Patriot Mortgage nor Brogan Weybright are state actors. Therefore, the *Monell* claims against them necessary fail. *See Grae-El v. City of Seattle*, 618 F. Supp. 3d 1080, 1086-87 (W.D. Wash. July 26, 2022) (noting state action requirement is "essential because § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrong.") (citation omitted) (cleaned up).

As is the case here, if the Court dismisses the claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c)(3). In considering whether to exercise supplemental jurisdiction, courts consider factors such as judicial economy, convenience, fairness, and comity. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010). Having considered these factors, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. As in *Schiewe v. Serv. Emps. Int'l Union Local 503*, 3:20-cv-00519-JR, 2020 WL 4251801, at *6 (D. Or. July 23, 2020), this case "has not proceeded beyond the pleadings stage and few judicial resources have been used, especially if the remaining claims are dismissed." Plaintiff has not

even served Defendants in this action. Thus, having considered the balance of factors, the Court declines to exercise supplemental jurisdiction in this case.[10]

IT IS SO ORDERED.

DATED this 3rd day of July, 2024.

　　　　　　　　　　　　　　　　　　　　　　/s/ Michael McShane  
　　　　　　　　　　　　　　　　　　　　　　Michael McShane  
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[10] Despite dismissing Plaintiff's state law claims, the Court notes that Plaintiff's alleged theory of foreseeability appears to stretch the limits of foreseeability to its limits. The claims appear to skate right up to, if not past, the line to consider claims being frivolous (as opposed to merely meritless). As Plaintiff borders on being considered a frequent filer, this is something judges (federal or state) will at some point consider when deciding whether an award of attorney fees to the prevailing party is appropriate.

11 – OPINION AND ORDER